UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MOSHE WAGH,                                     :
                                                :
                        Plaintiff,              :
                                                :
        - against -                             :
                                                :
ROBERT L. WILKIE, JR., *in his official*        :
*capacity as Secretary of Veteran Affairs*,     :
                                                :
                        Defendant.              :
------------------------------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #:_____ │
│ DATE FILED: 9/24/2020       │
└─────────────────────────────┘
```

18-CV-7726 (RWL)

**DECISION & ORDER:**
**MOTION FOR SUMMARY JUDGMENT**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Moshe Wagh ("Plaintiff" or "Dr. Wagh"), an attending anesthesiologist at the James J. Peters VA Medical Center (the "Bronx VA"), filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against his employer by proxy Robert L. Wilkie, Jr., the Secretary of Veteran Affairs ("Defendant" or the "VA"). Plaintiff essentially claims that, in raising his and his colleagues' salaries, the Bronx VA discriminated against him based on his being an Orthodox Jew. Presently before the Court is Defendant's motion for summary judgment, which seeks dismissal of all claims. For the reasons that follow, Defendant's motion is DENIED.

**Factual Background**[1]

**A.      Dr. Wagh's Employment with the Bronx VA**

Dr. Wagh, a practicing Orthodox Jew, is a licensed physician who specializes in anesthesia. (Pl. 56.1 Statement ¶¶ 1, 4.) The Bronx VA hired Dr. Wagh as an attending

---

[1] Unless otherwise noted, the facts are undisputed and are drawn from the parties' statements of material fact filed pursuant to Local Rule 56.1 and the evidence cited therein. (*See* Dkts. 44-1 ("Pl. 56.1 Statement"), 53 ("Def. 56.1 Statement"), and 56 ("Def. 56.1 Counterstatement").)

anesthesiologist in 1988; Dr. Wagh has worked at that facility in that capacity for the last thirty-two years without interruption.  (Pl. 56.1 Statement ¶ 5.)  Dr. Wagh is not board certified in anesthesiology, having twice failed the oral portion of the examinations.  (Dr. Wagh Dep. 44:7-9; 48:3-6, 21-23.[2])

Even so, evaluations of Dr. Wagh have consistently been above average, and recent assessments of his performance from his supervisor, the Chief of Anesthesiology, have included laudatory comments that Dr. Wagh "routinely provides our sickest patients with outstanding care"; "is truly an asset to our department"; and "remains the heart and soul of the anesthesiology department."  (Stark Decl. Ex. 4 at 3, Ex. 7 at 3.[3])

Although several of Dr. Wagh's fellow anesthesiologists are Jewish, none of them are Orthodox Jews.  (*Compare* Pl. 56.1 Statement ¶ 11 ("None of the anesthesiologists who worked at the Bronx VA from 2015 through the present, except for Plaintiff, was an Orthodox Jew."), *with* Def. 56.1 Counterstatement ¶ 11 (arguing that the cited evidence merely states Dr. Wagh's belief that none of his colleagues were Orthodox Jews and noting that "[a]bout one-half of the current anesthesiologists at the Bronx VA are Jewish").)[4]

---

[2] "Dr. Wagh Dep." means Excerpts from Transcript of Deposition of Dr. Moshe Wagh taken on Aug. 8, 2019, attached as Ex. 12 to Reddy Decl.  "Reddy Decl." means the Declaration of Kirti Vaidya Reddy dated Feb. 7, 2019.  (Dkt. 54.)

[3] "Stark Decl." means the Declaration of Corey Stark dated March 27, 2020.  (Dkt. 44.)

[4] Defendant misguidedly conflates Orthodox Judaism with other types of Judaism, glossing over Dr. Wagh's contentions that he was treated differently because he is a practicing Orthodox Jew, not merely because he is Jewish.  That said, Dr. Wagh's evidence on the religious status of his colleagues is thin – resting on his own beliefs on the issue.  (*See* Pl. 56.1 Statement ¶ 11 (citing own deposition testimony that none of his colleagues were Orthodox Jews).)  For purposes of addressing other issues,

**B.      Statutory Framework for Calculating Wages of VA Physicians**

Before discussing the wages at issue here, the Court briefly reviews the statutory parameters for calculating the wages of physicians practicing at VA facilities as codified in the Department of Veterans Affairs Health Care Personnel Enhancement Act of 2004, 38 U.S.C. § 7431 (the "Act").  According to the Act, total pay ("Total Pay") for physicians practicing within the Veterans Health Administration consists of three elements: (1) Base Pay; (2) Market Pay; and (3) Performance Pay.  38 U.S.C. § 7431(a).

Base Pay is controlled by the "Physician, Podiatrist, and Dentist Base and Longevity Pay Schedule," which designates fifteen "steps" of base pay.  38 U.S.C. § 7431(b)(1)-(2).  The amount of Base Pay payable to a physician "is based on the total number of the years of the service of the physician … in the Veterans Health Administration …."  38 U.S.C. § 7431(b)(3).  A physician's Base Pay is increased every two years, and reaches its maximum after a physician has served the Veterans Health Administration for more than 28 years.  38 U.S.C. § 7431(b)(3).

Unlike Base Pay, the amount of Market Pay is discretionary.  Market Pay is "pay intended to reflect the recruitment and retention needs for the specialty or assignment … of a particular physician … in a facility of the Department of Veterans Affairs."  38 U.S.C. § 7431(c)(2).  A physician's Market Pay is determined on a "case-by-case basis," and "shall" take the following factors into account: (1) "the level of experience of the physician … in the specialty or assignment of the physician …"; (2) "the need for the specialty or assignment of the physician … at the medical facility of the Department concerned"; (3) "the health care labor market for the specialty or assignment of the

---

however, the Court assumes, in favor of Plaintiff as the non-moving party, that Dr. Wagh was the only Orthodox Jewish attending anesthesiologist during the relevant period.

physician … which may cover any geographic area the Secretary considers appropriate for the specialty or assignment"; (4) "the board certifications, if any, of the physician"; (5) "the prior experience, if any, of the physician … as an employee of the Veterans Health Administration"; and (6) "such other considerations as the Secretary considers appropriate."  38 U.S.C. § 7431(c)(4)(A)-(F).  Market Pay must be evaluated "not less often than once every 24 months."  38 U.S.C. § 7431(c)(5).  Such adjustment cannot result in a reduction of Market Pay for a physician who retains his current position "unless there is a change in board certification or reduction of privileges."  38 U.S.C. § 7431(c)(6).

The third pay element, "Performance Pay," is determined "on the basis of the physician's … achievement of specific goals and performance objectives prescribed by the Secretary."  38 U.S.C. § 7431(d)(2).  The amount of Performance Pay in a given fiscal year "may not exceed the lower of" either $15,000 or 7.5% of the sum of the Base Pay and Market Pay payable to the physician who will receive it.   38 U.S.C. § 7431(d)(5)(A)-(B).

## C.     The 2016 Pay Raise

As of 2015, the Bronx VA employed six attending anesthesiologists in addition to Dr. Wagh: Dr. Arthur Schwartz, Dr. Joshua Mincer, Dr. Stella Piskorska, Dr. James Chien, Dr. Nishant Gandhi, and Dr. Nancy Lee.  (Pl. 56.1 Statement ¶ 9.)  Dr. Wagh had by far the longest employment with the VA among his attending colleagues.  (*See* Stark Decl. Exs. 9-16 at item 31 (start dates of Dr. Wagh and his colleagues).)

In late 2015, Dr. Steven Boggs, the then Chief of Anesthesiology at the Bronx VA, informed Dr. Sarah Garrison, the then Chief of Staff, that many of the attending

anesthesiologists were "dissatisfied" with their respective wages. (Pl. 56.1 Statement ¶ 29.) In response, Dr. Garrison obtained a compensation increase for each of the Bronx VA's attending anesthesiologists, except for Dr. Wagh. (Pl. 56.1 Statement ¶ 31.) According to Dr. Garrison, these increases to Market Pay were made to bring the attending anesthesiologists' Total Pay closer to the VISN average,[5] and no change was made to Dr. Wagh's salary because he was already above the VISN average at the time of the initial pay raise. (Garrison Dep. 231:19-232:2.[6])

**D.    The 2017 Pay Raise**

Following the 2016 raise, attending anesthesiologists at the Bronx VA remained dissatisfied with their compensation. (Pl. 56.1 Statement ¶ 33.) Dr. Boggs informed Dr. Garrison that many of the attending anesthesiologists were seeking employment elsewhere, and that nearly all had "secured *bona fide* job offers from other institutions." (Pl. 56.1 Statement ¶ 34.)

In December 2016, the attending anesthesiologists at the Bronx VA submitted a joint letter to Dr. Garrison and Dr. Erik Langhoff (the then Director of the Bronx VA) expressing their continued dissatisfaction with their compensation. (Pl. 56.1 Statement ¶ 35; Stark Decl. Ex. 8.) In that letter, the attending anesthesiologists stated that "many of our group will be unable to continue working at the VA because the current salary ranges are not competitive with the market value of the service we provide" as their current wages at the Bronx VA were "more than 2 standard deviations" below the

---

[5] VISN is an acronym for Veterans Integrated Services Network, which is composed of eighteen geographical regions of care in the United States. *About VHA*, U.S. Dep't of Veteran Aff., https://www.va.gov/health/aboutvha.asp (last visited September 24, 2020).

[6] "Garrison Dep." means Excerpts from Transcripts of Depositions of Sarah Garrison dated Aug. 12, 2019, and Sept. 26, 2019, attached as Ex. 3 to Stark Decl.

median salary for an anesthesiologist in the relevant area.  (Stark Decl. Ex. 8.)  The letter goes on to describe each of the attending anesthesiologists' experience and skills, and specifically notes that many are fielding offers from other institutions in the tri-state area.  (Stark Decl. Ex. 8.)  Although it did not state that Dr. Wagh was fielding other offers, the letter described Dr. Wagh as "the glue that binds our department together" and stated that, if raises are not given and there is a "mass exodus of departmental members," he would likely retire early.  (Stark Decl. Ex. 8.)

Shortly after receiving the letter, Dr. Garrison determined that all attending anesthesiologists were "qualified and entitled to receive a one-time, off-cycle" raise to their respective Market Pay, effective as of February 9, 2017.  (Pl. 56.1 Statement ¶ 36.)  The "major factors" considered in determining the raises were "board certification and market pay."  (Pl. 56.1 Statement ¶ 62; *see also* Garrison Dep. 203:9-19.)  Indeed, as reflected in the Compensation Panel Action forms requesting raises for Dr. Wagh and his colleagues, the only statutory factors for which information was noted were labor market data and board certification.  (Stark Decl. Exs. 12, 24; *see also* Garrison Dep. 192:5-7, 200:13-14 (admitting that years of service were not taken into account).)  The parties dispute who participated in determining the amount of the raises: Dr. Wagh maintains that Dr. Garrison, Dr. Langhoff, and Dr. Boggs were involved in setting and approving the raises; Defendant maintains that only Dr. Garrison and Dr. Langhoff were responsible.  (*See* Pl. 56.1 Statement ¶¶ 66, 68, 70; Def. 56.1 Statement ¶ 11.)

A chart summarizing the 2017 raises to each attending anesthesiologist's pay appears below:

| Physician | Market Pay Pre-Feb. 9, 2017 | Market Pay Post-Feb. 9, 2017 | Market Pay Raise 2017 | Percent Increase in Market Pay | Total Pay as of Feb. 9, 2017 |
|---|---|---|---|---|---|
| Plaintiff | $139,062 | $148,846 | $9,784 | 7% | $295,000 |
| Dr. Chien | $160,013 | $206,235 | $46,222 | 29% | $315,000 |
| Dr. Gandhi | $159,033 | $209,634 | $50,601 | 32% | $315,000 |
| Dr. Lee | $144,043 | $193,033 | $48,990 | 34% | $295,000 |
| Dr. Mincer | $160,013 | $209,634 | $49,621 | 31% | $315,000 |
| Dr. Piskorska | $160,013 | $206,235 | $46,222 | 29% | $315,000 |
| Dr. Schwartz | $157,013 | $206,235 | $49,222 | 31% | $315,000 |

(Pl. 56.1 Statement ¶¶ 38-45, 49-54; Stark Decl. Exs. 9-15.)   Both Dr. Wagh and Dr. Lee, the two doctors who received the lower Total Pay of $295,000, were not board certified; their other colleagues, whose salary was set $20,000 higher, were each board certified.  (*See* Stark Decl. Exs. 12, 24; Def. 56.1 Statement ¶ 30.)  As a result of these "one time, off-cycle" raises to Market Pay, Dr. Wagh went from being one of the highest paid attending anesthesiologists at the Bronx VA to one of the lowest – despite having had "many more years of experience as an anesthesiologist," and having worked at the Bronx VA for longer, than each of the other attending anesthesiologists.  (Pl. 56.1 Statement ¶¶ 37, 56.)

**E.    Events Following the 2017 Pay Raise**

After the 2017 raises went into effect, Dr. Wagh lodged a complaint with management about his compensation and received an additional $10,000 raise to his

Market Pay, bringing his Total Pay to $305,000.[7]   (Def. 56.1 Statement ¶¶ 34-35; Pl. 56.1 Statement ¶¶ 71-72.)   Despite that further increase, on August 8, 2017, Dr. Wagh wrote to Dr. Garrison, stating that his overall raise "completely disregarded [his] longevity … and appeared to single [him] out …."   (Stark Decl. Ex. 26.)   Dr. Garrison responded two days later, stating that the additional $10,000 raise "acknowledg[ed] the duration of [his] service," but that "[s]alary determinations within a given service include many factors, including duration of service and board certification status."   (Stark Decl. Ex. 26.)   The record is unclear as to what, if anything further, Dr. Garrison did in response to Dr. Wagh's email.   (*See* Def. 56.1 Counterstatement ¶ 76.)

On December 8, 2017, Dr. Garrison and Dr. Langhoff received notice that Dr. Wagh had filed an Equal Employment Opportunity complaint with the VA's Office of Resolution, Management, Diversity & Inclusion "regarding his pay."   (Stark Decl. Ex. 27.)

On August 15, 2018, Dr. Garrison sent an email to Madeline Eydt (the EEO Program Manager and ADR Coordinator at the Bronx VA) summarizing the information she was "able to find" regarding VA anesthesia salaries, which included 2016 salaries for VA anesthesiologists in East Orange, New York, Brooklyn, Northport, Castle Point, and the Bronx (purportedly collected by HR) and the "[s]tatus of board certification and salaries" provided to Dr. Garrison from chiefs of staff of other VA facilities.   (Stark Decl. Ex. 28.)   The August 15, 2018 email does not indicate when the data was collected.

---

[7]  The parties dispute what prompted Dr. Wagh's additional raise.  Defendant maintains that Dr. Wagh complained to Dr. Garrison that "recent graduates were receiving the same salary as him."   (Def. 56.1 Statement ¶ 34.)   Dr. Wagh counters that he initially raised his complaint about "disparate wages" with Dr. Schwartz who then discussed the matter with Dr. Garrison.   (Pl. 56.1 Statement ¶¶ 71-72.)

Between April 30, 2017, and August 5, 2019, the Bronx VA hired four additional attending anesthesiologists: Dr. Mark Trentalange, Dr. Adrienne Gleit, Dr. Edward Mattison, and Dr. Joanna Miller.  (Pl. 56.1 Statement ¶ 10.)  At the time they were hired, Dr. Mattison and Dr. Trentalange were board certified (Garrison Dep. 199:4-10); Dr. Miller was not board certified but was board eligible and had already passed one of three exams for certification (Miller Dep. 16:14-25[8]); and Dr. Gleit was not board certified when hired but became board certified shortly thereafter (Garrison Dep. 162:8-10; Pl. 56.1 Statement ¶ 87).   The table below summarizes the salaries of the four physicians upon hiring and shortly thereafter as compared to Dr. Wagh's salary after the 2017 Market Pay raises:

| Physician | Base Pay | Market Pay | Difference in Market Pay over Dr. Wagh | Total Pay |
|---|---|---|---|---|
| Dr. Wagh after 2017 raise | $139,062 | $148,846 | N.A. | $305,000 |
| Dr. Trentalange | $101,967 | $213,033 | $64,187 | $315,000 |
| Dr. Mattison | $103,395 | $211,605 | $64,187 | $315,000 |
| Dr. Miller | $104,843 | $190,157 | $42,000 | $295,000 |
| Dr. Gleit (Hired) Board Certified | $101,967 $101,967 | $193,033 $213,033 | $44,187 $64,187 | $295,000 $315,000 |

(*See* Stark Decl. Exs. 16, 17, 18, 20, 21, 22.)

**Procedural History**

On August 24, 2018, Dr. Wagh filed the instant action seeking to recover damages for religious discrimination in violation of Title VII of the Civil Rights Act of

---

[8] "Miller Dep." means Excerpts from Transcript of Deposition of Joanna Charmy Miller taken Sept. 5, 2019, attached as Ex. 19 to Stark Decl.

1964.  (Dkt. 1.)  On November 16, 2018, the parties consented to the jurisdiction of the undersigned for all purposes including, but not limited to, decisions on dispositive motions.  (Dkt. 11.)  On May 22, 2020, Defendant filed the instant motion for summary judgment seeking dismissal of Dr. Wagh's claims.  (Dkt. 38.)  That same day, Dr. Wagh filed his opposition.  (Dkts. 39-42.)  On May 26, 2020, Defendant filed its motion papers.  (Dkts. 47-49.)  The next day, Defendant filed its reply in further support of its motion for summary judgment.  (Dkt. 47.)  The Court held oral argument on September 22, 2020.

## Legal Standards

### A.    Summary Judgment

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The Court's task is not to resolve contested issues of fact, but rather to determine whether there exists any disputed issue of material fact.  *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986).  "A fact is material when it might affect the outcome of the suit under governing law."  *Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, 421 F. App'x 97, 101 (2d Cir. 2011) (summary order) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).  A dispute "is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

"The moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *Federal Deposit Insurance Corp. v. Great American Insurance Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Celotex Corp.,* 477 U.S. at 323).  Once this burden is met, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson*, 477 U.S. at 249).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

"All evidence submitted on the motion is to be construed in the manner most favorable to the nonmoving party."  *Okin v. Village of Cornwall-On-Hudson Police Department*, 577 F.3d 415, 427 (2d Cir. 2009) (quoting *Horvath v. Westport Library Association*, 362 F.3d 147, 151 (2d Cir. 2004)).  However, "[t]o defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Great American Insurance Co.,* 607 F.3d at 292 (first quoting *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); and then quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248; *see also Knight*, 804 F.2d at 11-12 ("[T]he mere existence of factual issues – where those

issues are not material to the claims before the court – will not suffice to defeat a motion for summary judgment") (quoting *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)).

## B.   Employment Discrimination

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Motions for summary judgment in discrimination cases are evaluated using the three-part burden-shifting test set forth by the Supreme Court in *McDonnell Douglas Corp. v Green*, 411 U.S. 792, 802-05 (1973) ("*McDonnell Douglas*").   *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (applying the *McDonnell Douglas* framework to Title VII); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) (same).

Under that framework, the initial burden is on the plaintiff to establish a *prima facie* case of discrimination.   *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir . 2001). Once the plaintiff has established a *prima facie* case of discrimination, "a presumption arises that his employer unlawfully discriminated against him," which the employer must then rebut with "legitimate nondiscriminatory reasons for its adverse actions toward plaintiff."   *Mandell v. County of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2003).

Where the employer proffers such a basis for its actions, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that "the real reason for the adverse employment decision was discrimination."   *Id.* at 381.   To satisfy this burden,

"[t]he plaintiff must submit 'admissible evidence that shows circumstances that would be sufficient to permit a rational finder of fact to infer that the employer's employment decision was more likely than not based in whole or in part on discrimination.'"  *Abdelal v. Kelly*, No. 13-CV-4341, 2020 WL 1528476, at *6 (S.D.N.Y. March 30, 2020) (quoting *Kirkland*, 760 F.3d at 225) (alterations omitted).  "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors."  *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotation marks and citations omitted).

Although summary judgment may be and has been granted in employment discrimination cases, the Second Circuit has warned that "trial court[s] must be cautious about granting summary judgment to an employer when … intent is at issue."  *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Mandell*, 316 F.3d at 377 ("In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because 'careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination.'") (quoting *Graham v. Long Island Railroad*, 230 F.3d 34, 38 (2d Cir. 2000)).  The court's "function at this stage is to identify issues to be tried, not decide them."  *Graham*, 230 F.3d at 38; *see also Gallo*, 22 F.3d at 1224 (2d Cir. 1994) ("[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.").

13

## Discussion

Defendant maintains that Dr. Wagh has failed either to make out a *prima facie* case of discrimination or present a triable issue of fact that Defendant's "real reason" for refusing to raise Dr. Wagh's market pay commensurately with his colleagues' was religious discrimination. Dr. Wagh opposes, arguing that he has satisfied his burden at each stage of the *McDonnell Douglas* framework and that summary judgment is accordingly inappropriate. For the reasons stated below, the Court agrees with Dr. Wagh.

### A.   *Prima Facie* Case

To establish a *prima facie* case of unequal pay for equal work pursuant to Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he was "paid less than non-members of [his] class for work requiring substantially the same responsibility"; and (3) there is evidence of discriminatory animus. *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999); *see also Chepak v. New York City Health and Hospitals Corp.*, No. 11-CV-9698, 2015 WL 509279, at *9 (S.D.N.Y. Feb. 5, 2015) (same), *aff'd*, 643 F. App'x 62 (2d Cir. 2016) (summary order); *Potash v. Florida Union Free School District*, 972 F. Supp. 2d 557, 579 (S.D.N.Y. 2013) (same).

The Second Circuit has repeatedly noted that "[t]he burden of establishing a *prima facie* case under *McDonnell Douglas* is minimal," *Mandell*, 316 F.3d at 378, even going so far as to deem it "*de minimis*." *Abdu-Brisson*, 239 F.3d at 468; *see also Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) ("The Supreme Court has used the adjective 'minimal' to describe the burden of establishing a *prima facie* case of discrimination in violation of Title VII … and we have likewise held that the 'plaintiff's

burden of establishing a *prima facie* [Title VII] case is *de minimis*.'") (first quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); and then quoting *Abdu-Brisson*, 239 F.3d at 467). That is "because all the *prima facie* showing does is force defendant to offer an explanation." *Cully v. Milliman & Robertson, Inc.*, 20 F. Supp. 2d 636, 641 (S.D.N.Y. 1998).

Even so, establishing a *prima facie* case of discrimination is "a real requirement that can lead to dismissal if not met." *Carr v. Health Insurance Plan of Greater New York, Inc.*, 111 F. Supp. 2d 403, 413 (S.D.N.Y. 2000). And allegations of discrimination that "are conclusory and wholly without evidentiary support" will not suffice. *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (summary order); *see also Taylor v. Polygram Records*, No. 94-CV-7689, 1999 WL 124456, at *16 (S.D.N.Y. March 8, 1999) ("[Plaintiff's] belief, based on no evidence other than gut instinct, that [employer] treated her with hostility because of her race, cannot justifiably support an inference of discrimination when nothing in the record remotely links [employer's] treatment of her to her race.").

Here, the Defendant argues that Dr. Wagh has failed to meet either the second or third requirements for a *prima facie* case of discrimination. First, Defendant contends that Dr. Wagh cannot present evidence that he was paid less than his "similarly situated" coworkers because "[t]here is no evidence that nonboard-certified anesthesiologists who were not Orthodox Jews received a higher total compensation than Plaintiff." (Def. Mem. at 11-12.[9]) Second, Defendant argues that Dr. Wagh has not made a *prima facie* showing that Defendant's decision to raise Dr. Wagh's Market

---

[9] "Def. Mem." means Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment. (Dkt. 52.)

Pay less than others was motivated by discriminatory animus, asserting that Dr. Wagh has not presented any evidence that religion played "any role" in that decision.  (Def. Mem. at 11.)  The Court addresses each argument in turn.

### 1.     Paid Less Than "Similarly Situated" Non-Orthodox Colleagues

As stated above, a plaintiff alleging pay disparity under Title VII must show that he was "paid less than non-members of [his] class for work requiring substantially the same responsibility."  *Belfi*, 191 F.3d at 139.  In other words, Dr. Wagh must show that he was paid less than "similarly situated" non-members of his protected class.  *Potash*, 972 F. Supp. 2d at 579.  Defendant's argument is straight forward: Dr. Wagh cannot demonstrate that he was paid less than his non-Orthodox, non-board-certified colleagues because they all received the same Total Pay following the 2017 Market Pay raises.  Dr. Wagh counters that other anesthesia attendings at the Bronx VA "who had the same job duties and responsibilities as Dr. Wagh, at the same location, and in the same department, but who are not Orthodox Jews, received considerably more in wages than Dr. Wagh, even though their qualifications did not approach his own."  (Pl. Opp. at 17.[10])  Embedded within the parties' respective positions are two issues that the Court must assess: (1) whether to consider Dr. Wagh's "Total Pay" or "Market Pay" or both when determining whether Dr. Wagh was "paid less"; and (2) whether Dr. Wagh can be considered "similarly situated" to his board-certified colleagues, not merely those who were not board certified.

---

[10] "Pl. Opp." means Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.  (Dkt. 43.)

a.     "Market Pay" Versus "Total Pay"

As an initial matter, the Court notes that neither party provides any analysis of their assertions about which pay – Market Pay or Total Pay – should be the focus for evaluation.  Instead, each party seems to conclude without providing support that its position is the correct one and glosses over any argument otherwise.  (*See* Pl. Opp. at 17-18 (arguing that the disparity in Plaintiff's Market Pay as compared to his less experienced colleagues is sufficient to show a *prima facie* claim); Def. Reply at 10[11] (arguing in the midst of a misplaced "disparate impact" argument that Plaintiff's "focus on the market pay disparity belies the fact that it is the anesthesiologist's total salary that is considered in the general market, not just a portion of the total compensation determined by the VA as market pay").[12])

No courts in this District have spoken directly on this issue.  In looking to districts in other jurisdictions, the Court found a lone opinion contrasting Market Pay against Total Pay in the context of a pay disparity claim: *Kennedy v. McDonald*, No. 3:15-1844,

---

[11] "Def. Reply" means Defendant's Reply Memorandum of Law in Support of Its Motion for Summary Judgment.  (Dkt. 55.)

[12] Defendant contends that Dr. Wagh's arguments regarding Defendant's application of the statutory pay factors advance a "disparate impact" claim under Title VII.  (*See* Def. Reply at 10.)  Although both arise from Title VII, a "disparate impact" claim – which centers on a specific employment practice or policy that affects similarly situated employees differently – is distinct from a "disparate treatment" claim like the one Dr. Wagh advances.  *See Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 328 n.16 (S.D.N.Y. 2015) ("A plaintiff can assert a Title VII claim under two different legal theories – disparate impact or disparate treatment.").  As neither Dr. Wagh's complaint or opposition papers advance a disparate impact claim, the Court will not address Defendant's arguments rooted in that theory.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (explaining that a party cannot advance a claim for the first time through statements made in motion papers); *Barton v. Warren County*, No. 19 CV 1061, 2020 WL 4569465, at *12 n.6 (N.D.N.Y. Aug. 7, 2020) (declining to address disparate impact claims advanced in motion papers where complaint only raised disparate treatment claim).

2017 WL 1162978 (D.S.C. March 29, 2017), *adopting in part and rejecting in relevant part R. & R.*, 2016 WL 11545907 (D.S.C. Dec. 28, 2016).  In *Kennedy*, the District of South Carolina was tasked with assessing whether a staff anesthesiologist at the William Jennings Bryan Dorn VA Medical Center ("Dorn Medical Center") had established a *prima facie* case of age discrimination under the Age Discrimination in Employment Act ("ADEA") where the plaintiff presented evidence that Dorn Medical Center improperly calculated his Market pay – effectively decreasing his Market Pay as his Base Pay rose – resulting in plaintiff being paid the same Total Pay but less Market Pay than his junior peers.  2017 WL 1162978, at *3.

Concluding that the plaintiff had set forth a *prima facie* case, the court rejected the argument (and the Magistrate Judge's recommendation) that it should review only the plaintiff's Total Pay (as opposed to plaintiff's Market Pay) in assessing plaintiff's pay disparity claims where defendant's pay decisions were "attempt[s] to ensure all anesthesiologists … receive[d] comparable salaries" as doing so would ignore that the calculation of Market Pay is controlled by the statutory factors codified in 38 U.S.C. § 7431(c)(4).  *Kennedy*, 2017 WL 1162978, at *5.  As the court aptly noted, assessing the downward adjustments to the plaintiff's Market Pay in tandem with 38 U.S.C. § 7431(c)(4) "compel[led] the conclusion that Plaintiff's experience serving Dorn Medical Facility ha[d] rendered him less valuable over time," which was not supported by the record and which "would seem incongruent with the purposes underl[y]ing the Pay Act." *Id.*

The Court finds this analysis persuasive.  Whether or not the Bronx VA's adjustments to Market Pay were efforts to make its anesthesiologists' salaries

comparable to those of others at sister VA facilities and in the private sector, the Court cannot ignore the clear directives contained in 38 U.S.C. § 7431 to assess different components of a VA physician's Total Pay – Base, Market, and Performance – by specific criteria.   To focus solely on Total Pay and not Market Pay would allow potentially discriminatory conduct to go undetected.

This can be illustrated as follows.   As explained above, the Act mandates consideration of several factors in setting Market Pay – including at least the employee's experience, both in specialty and with the VA; board certification; the particular VA facility's specialty needs; and local market rates.   *See* 38 U.S.C. § 7431(c)(4)(A)-(E).   Three of those factors can be expected to weigh in favor of increasing Dr. Wagh's salary.   It is undisputed that Dr. Wagh "had many more years of experience as an anesthesiologist, and had worked for the VA longer, than each of the other staff anesthesiologists …" (Pl. 56.1 Statement ¶ 56; Def. 56.1 Counterstatement ¶ 56), and that Plaintiff was considered by his colleagues to be the "the glue that binds our department together."  (Stark Decl. Ex. 8.)

Yet the evidence indicates that Defendant ignored these factors in setting the 2017 salaries and instead considered only local market rates and board certification. (Pl. 56.1 Statement ¶ 62; Stark Decl. Exs. 12, 24; Garrison Dep. 192:5-7, 200:13-14, 203:9-19.)  Why Defendant gave short shrift to the other factors may have a perfectly valid non-discriminatory explanation, but it is an explanation that merits consideration in light of its effect on Dr. Wagh's Market Pay and, consequently, Total Pay relative to his colleagues.   As in *Kennedy*, factors that likely would result in Dr. Wagh's receiving higher Market Pay, and therefore Total Pay, than he did were simply ignored, and the

Bronx VA effectively penalized him for his longevity rather than giving him the benefit it otherwise would provide.  Whether or not that is because of discriminatory animus is another question, but, regardless, Dr. Wagh receives less pay relative to his colleagues than he otherwise would if all mandatory factors were considered.

Accordingly, the Court will consider the adjustments to both Market Pay and Total Pay in assessing Dr. Wagh's claims.  With that in mind, it is clear that Dr. Wagh has established that he was paid less than his non-Orthodox colleagues.  Plaintiff indisputably received a lower Market Pay raise, both in absolute terms and percentage terms, than both his non-board-certified and board-certified colleagues.  Dr. Lee, the only other non-board-certified anesthesiologist at the Bronx VA at the time of the 2017 raises, was paid $44,187 more in Market Pay than Dr. Wagh after those raises.  (Pl. 56.1 Statement ¶¶ 45-47.)  Similarly, Dr. Wagh's board-certified colleagues were paid between $57,389 and $60,789 more in Market Pay than Dr. Wagh following the 2017 raises.  (Pl. 56.1 Statement ¶¶ 39, 41, 43, 50, 52, 54.)  Again, Defendant may have good reasons for why Dr. Wagh received considerably less Market Pay, but that is a separate issue discussed later.

With respect to Total Pay, Dr. Wagh received more pay than his sole non-board-certified colleague, Dr. Lee.  But Dr. Wagh has established that he received less Total Pay than his board-certified colleagues.  They each received Total Pay of $315,000 while Dr. Wagh received, ultimately, $305,000.  Again, there may be perfectly good reasons for why that is so, but, regardless, Dr. Wagh received less pay.  Accordingly, Dr. Wagh has met his initial burden with respect to the "less pay" portion of the second element of his discrimination claim.

b.    "Similarly Situated" Colleagues

Defendant argues that Dr. Wagh is not "similarly situated" to his more marketable, board-certified colleagues.  (Def. Reply at 7-8.)   The Court disagrees, finding instead that a genuine issue of material fact exists as to whether Plaintiff is "similarly situated" to his board-certified colleagues.  *See Graham*, 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury."); *accord Harrison v. Port Authority of New York and New Jersey*, No. 17-CV-6281, 2020 WL 1233637, at *6 (S.D.N.Y. March 13, 2020); *cf. Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790-91 (2d Cir. 2007) ("this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met'") (quoting *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

In articulating the standard for discrimination based on disparate treatment, the Second Circuit has stated that "a plaintiff must allege that '[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself].'" *Brown v. Daikin America Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 39).   What constitutes "all material respects" is case-specific and thus varies from case to case.  *Id.*  But it is well settled that a plaintiff does not need to show that he is "identical" to a co-worker in order to satisfy this prong of a *prima facie* discrimination case.  *Ruiz v. County of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40).   Instead, "the judgment rests on 'whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards,'" such

that "[t]he plaintiff's and comparator's circumstances … bear a 'reasonably close resemblance.'" *Brown*, 756 F.3d at 230 (quoting *Graha*m, 230 F.3d at 40).

Similarity depends on "actual job content," which the Second Circuit has stated consists of more than "identical job titles." *Byrne v. Telesector Resources Group, Inc.*, 339 F. App'x 13, 16 (2d Cir. 2009) (summary order). Employment characteristics that can support the conclusion that two employees are "similarly situated" pursuant to Title VII include "similarities in education, seniority, performance, and specific work duties" and "similar requirements for skill, effort and responsibility for jobs performed under similar working conditions." *Potash v. Florida Union Free School District*, 972 F. Supp. 2d 557, 580 (S.D.N.Y. 2013) (internal quotation marks and citations omitted); *see Chan v. NYU Downtown Hospital*, No. 03-CV-3003, 2006 WL 345853, at *4 (S.D.N.Y. Feb. 14, 2006) (characterizing "similarly situated" in terms of "responsibilities, tenure, experience, background, qualifications, education, etc."); *Quarless v. Bronx-Lebanon Hospital Center*, 228 F. Supp. 2d 377, 383-84 (S.D.N.Y. 2002) ("in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's") (citation omitted).

The record here is sparse with respect to the educational history, seniority, and performance backgrounds of Dr. Wagh's non-Orthodox colleagues, all of which are considerations for establishing whether an employee is "similarly situated" to a proposed comparator. *Potash*, 972 F. Supp. 2d at 580. Dr. Wagh highlights this factual gap, condemning Defendant for "manifest[ing] sheer indifference to the qualifications of everybody else" and for failing to "bother conducting analyses of the background,

performance, or accomplishments of Dr. Wagh's fellow anesthesiologists" when pay determinations were made.  (Pl. Opp. at 13.)  But, as described above, the parties do not dispute Dr. Wagh's comparatively greater experience and tenure with the Bronx VA and his importance to the department.

Defendant appears to concede that Dr. Wagh is "similarly situated" to his non-board-certified, non-Orthodox colleagues (Def. Mem. at 11-12), but maintains that Dr. Wagh is not "similarly situated" to his board-certified, non-Orthodox colleagues as they "are more marketable than him because they are board certified and board eligible, even though they may have less tenure at the VA" (Def. Reply at 7).  Defendant's argument is not without merit.  After all, "board certification" is one of the factors to be considered when determining Market Pay for physicians at VA facilities.  38 U.S.C. § 7431(c)(4)(D); *see Meyer v. McDonald*, 241 F. Supp. 3d 379, 383-85 (E.D.N.Y. 2017) (recognizing that board certification may increase a physician's value, and granting summary judgment dismissing psychiatrist's claim of age discrimination against VA employer that rejected plaintiff, who was not board certified, and filled position with a younger, board-certified candidate), *aff'd sub nom. Meyer v. Shulkin*, 722 F. App'x 26 (2d Cir. 2018) (summary order).

It is disingenuous, however, for Defendant to rely on only one of the criteria by which pay was to be determined – board certification – to negatively distinguish Dr. Wagh from his colleagues, while ignoring factors that positively distinguish him (again, experience, tenure at the VA, importance to the Bronx VA).  Moreover, the record contains considerable evidence of relevant considerations – such as requirements for duties, skills, and performance – suggesting that Dr. Wagh is similarly situated to his

colleagues, regardless of board certification.  *Potash*, 972 F. Supp. 2d at 580.  Thus, for example, it is undisputed that Dr. Wagh, like his colleagues, is a licensed physician who specializes in anesthesia.  (Pl. 56.1 Statement ¶ 4.)  It is also undisputed that Dr. Wagh held the same "Category 1" clinical privileges as all of the other anesthesiologists at the Bronx VA.[13]   (Garrison Dep. 196:21-25.)   And Dr. Garrison affirmed that the anesthesiologists at the Bronx VA "can all do the same things" and was unaware of any tasks that other anesthesiologists could do that Dr. Wagh could not do.  (Garrison Dep. 197:2-7.)

Dr. Wagh's performance reviews also suggest that his responsibilities and skills are similar to those of his board-certified peers.  Those reviews consistently refer to Dr. Wagh as a "very experienced, hard working and conscientious anesthesiologist" who "is routinely called upon by other practitioners to provide technical or decision making assistance."  (Stark Decl. Ex. 4 (performance review dated November 15, 2017); *see also* Stark Decl. Ex. 5 (performance review dated November 15, 2018 referring to Dr. Wagh as "an experienced, knowledgeable and dedicated anesthesiologist" who is "routinely called upon to assist other members of the department to provide clinical recommendations or technical assistance); Stark Decl. Ex. 6 (performance review dated May 11, 2018 stating same).)

In light of the minimal showing necessary to make a *prima facie* case, and the considerable evidence that Dr. Wagh and his colleagues could all perform the same tasks, had the same responsibilities, and were subject to the same standards, the Court

---

[13] Dr. Garrison testified that "Category 1" privileges are "granted when there is evidence that the physician has the training, background, and expertise to receive them" and when physicians "have established that they're able to work independently."  (Garrison Dep. 56:10-18.)

finds that a reasonable jury could determine that Dr. Wagh and his board-certified colleagues are similarly situated. *See Jaquez v. New York City Health and Hospitals Corporation*, No. 14-CV-3393, 2016 WL 155279, at *6 (S.D.N.Y. Jan. 12, 2016) (assuming *arguendo* and for purposes of summary judgment that plaintiff met requirement to show *prima facie* case of pay disparity despite lingering questions over whether plaintiff had met his burden of proof with respect to the "similarly situated" prong).

### 2.    Discriminatory Animus

The Court next assesses whether Dr. Wagh has presented a *prima facie* case that the Bronx VA's compensation decisions were motivated by discriminatory animus. While Defendant argues that Dr. Wagh has not proffered "any evidence" that religion "played any role" in the pay decision at issue, and thus failed to satisfy this initial burden, Dr. Wagh counters that there are three separate bases by which he has satisfied his *prima facie* burden: (1) the "considerable" size of the pay disparity between Plaintiff and his fellow anesthesia attendings; (2) discriminatory statements made against Jews and Dr. Wagh by Dr. Boggs and Dr. Langhoff, the two physicians "who decided what the pay should be"; and (3) Dr. Garrison's failure to investigate Dr. Wagh's initial complaint of discrimination.  (Pl. Opp. at 17-19.)  The Court addresses each of these bases in turn.

### a.    "Considerable" Pay Disparity

Dr. Wagh first argues that the "considerable" difference between his Market Pay and the Market Pay of his less experienced, non-Orthodox colleagues evinces discrimination.  Dr. Wagh points specifically to Drs. Gleit, Trentalange, and Mattison as

examples.  All three of these physicians were hired after the February 2017 Market Pay raises went into effect, and all were given starting salaries that included between $40,000 and $50,000 more Market Pay than Dr. Wagh.  (Pl. Opp. at 17; Pl. 56.1 Statement ¶¶ 79, 85, 90.)  In response, Defendant echoes its argument that Dr. Wagh's focus on Market Pay rather than Total Pay is misplaced.  Separately, Defendant argues that evidence that other Jewish anesthesiologists received significant raises negates Dr. Wagh's argument that his own, smaller raise was motivated by religious discrimination. (Def. Reply at 10; Def. Mem. at 11.)

The Court addresses Defendant's arguments first, both of which have been rejected by earlier portions of this decision.  For the reasons stated above, both Market Pay and Total Pay are relevant.  And Defendant's second argument is another example of conflating Orthodox Judaism with other forms of Judaism.  Dr. Wagh contends that he was treated differently than his similarly situated, non-Orthodox colleagues.  Sizable raises to non-Orthodox attending anesthesiologists – Jewish or not – do not evince otherwise.

The Court now turns to assessing whether the "considerable" difference between Dr. Wagh's Market Pay and the Market Pay of his less-experienced, non-Orthodox colleagues is *prima facie* evidence of discriminatory animus.  Dr. Wagh cites no case law in support of his argument, seemingly positing that the sizeable differences between his Market Pay and the Market Pay of his non-Orthodox colleagues speaks for itself. That being said, the Court agrees with Dr. Wagh that the difference between his Market Pay and the Market Pay of his non-Orthodox colleagues is significant.  It is undisputed that the upward adjustments to Market Pay for all other attending anesthesiologists (i.e.,

all non-Orthodox anesthesiologists) ranged between $46,000 and $50,000, while Dr. Wagh's was $9,784.  (Pl. 56.1 Statement ¶¶ 38-45, 49-54; Stark Decl. Exs. 9-15.)  It is also undisputed that anesthesiologists who were subsequently hired – including one who had only just completed her residency program – earned between $44,000 and $64,000 more in Market Pay than Dr. Wagh and, before Dr. Wagh complained, the same total salary as Dr. Wagh, despite Dr. Wagh's having practiced anesthesiology at the VA for over thirty years.  (Pl. 56.1 Statement ¶¶ 79, 82-83, 85, 90.)  In sum, all non-Orthodox attending anesthesiologists earned at least $44,000 more in Market Pay than Plaintiff following the 2017 raises.

Quite apart from the absolute differential in the Market Pay raise, the differential in Market Pay raises is all the more significant because those raises well exceed the value that Defendant attributed to board certification.   The information on pay differences between board-certified and non-board-certified anesthesiologists at other VA locales (albeit obtained after the fact), showed that board certification provided approximately $10,000 to $25,000, or more, in value.[14]  (Stark Decl. Ex. 28.)  That leaves anywhere from $19,000 (the difference between $44,000 and $25,000) to $54,000 (the difference between $64,000 and $10,000) unaccounted for by the amount that the Bronx VA's research attributed to board certification.  Similarly, in setting the 2017 raises, Defendant attributed a value of $20,000 to board certification.  (*See* Reddy Decl. Ex. 6 (Dr. Garrison email recommending $315,000 for board certified anesthesiologists, and $295,000 for those not certified).)  But the differential in Market

_____

[14] One outlier suggests a difference of $90,000 between board-certified and non-board-certified status.  (*See* Stark Decl. Ex. 28 (New Jersey noted as having one "nonboard certified, salary of $220K" and a second non-board-certified "recent graduate who is expected to certify soon; salary is $310,000").)

Pay was $46,000 to $50,000 as between Dr. Wagh and his board-certified colleagues, leaving $26,000 to $30,000 unexplained by board certification.

Considering the minimal pleading standard necessary to establish a *prima facie* case of discrimination, the fact that Dr. Wagh – an experienced, well-respected attending anesthesiologist who had been with the Bronx VA for thirty-two years and came to be considered "the heart and soul of the anesthesiology department" (Stark Decl. Ex. 7) – earned substantially less Market Pay than recent graduates could support a reasonable jury's finding that Defendant had untoward motives in setting Dr. Wagh's pay. *See Jaquez*, 2016 WL 155279, at *6 (concluding that $10,000 pay gap between plaintiff's salary and coworkers could prompt a reasonable juror to "infer discrimination on the basis of the large gap") (citing *Norville v. Staten Island University Hospital*, 196 F.3d 89, 95 (2d Cir. 1999)).

### b.   Statements by Dr. Boggs and Dr. Langhoff

Plaintiff also points to allegedly invidious statements made by two other physicians at the Bronx VA – Drs. Boggs and Langhoff – to support his *prima facie* case that his 2017 market pay raise was motivated by discriminatory intent. Specifically, Dr. Wagh asserts that soon after participating in the 2017 pay raises, Dr. Boggs, the then Chief of Anesthesiology, told a group of anesthesiologists, including Dr. Wagh, that the Bronx VA "should not hire any more Jews in the Anesthesia Department".[15]  (*See* Pl. 56.1 Statement ¶ 67; Def. 56.1 Counterstatement ¶ 67 (denying that Dr. Boggs participated in the 2017 market pay raise, but remaining silent as to whether Dr. Boggs

---

[15] Dr. Schwartz testified that Dr. Boggs stated that "we should not hire more Jews because we can't staff the Jewish holidays." (Excerpts from Transcript of Deposition of Andrew Schwartz taken Sept. 5, 2019, attached as Ex. 23 to Stark Decl. ("Schwartz Dep."), 76:20-24.)

made the comment alleged); *see also* Dr. Wagh Dep. 83:15-19.)  In addition, Dr. Wagh asserts that Dr. Langhoff, the then Director of the Bronx VA, purportedly asked Dr. Boggs "Who cares about Dr. Wagh?" during the same time period.  (Pl. 56.1 Statement ¶ 69; Dr. Wagh Dep. 79:6-11.)  Defendant does not deny that these statements were made, but contests their relevance to Dr. Wagh's claim.  (Def. Mem. 11; Def. Reply 6-7.)

The Second Circuit has held that "an inference of discriminatory intent may be established by, *inter alia*, 'the employer's … invidious comments about others in the employee's protected group."  *Sassaman*, 566 F.3d at 312 (quoting *Abdu-Brisson*, 239 F.3d at 467); *see also Nidzon v. Konica Minolta Business Solutions, USA, Inc.*, 752 F. Supp. 2d 336, 351 (S.D.N.Y. 2010) ("Verbal comments can support a finding of discriminatory intent when 'a plaintiff demonstrates that a nexus exists between the allegedly discriminatory comments and defendant's decision ….'") (quoting *Prinin v. Raffi Custom Photo Laboratory, Inc.*, 383 F. Supp. 2d 628, 636 (S.D.N.Y. 2005)).

In contrast, mere "stray remarks," without more, generally do not constitute sufficient evidence to support a case of employment discrimination.  *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).  "[T]he purpose of characterizing a remark as 'stray' is 'to recognize that all comments pertaining to a protected class are not equally probative of discrimination.'"  *Liburd v. Bronx Lebanon Hospital Center*, No. 07-CV-11316, 2009 WL 900739, at *4 (S.D.N.Y. April 3, 2009) (quoting *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)), *aff'd*, 372 F. App'x 137 (2d Cir. 2010) (summary order).  To assess how "probative of discrimination" a given remark is, the Court must consider it in context, acknowledging that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they

prove that the action was motivated by discrimination" and "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Id.* (quoting *Tomassi*, 478 F.3d at 115).

Consistent with that guidance, the Second Circuit has endorsed a framework that considers: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see also Nidzon*, 752 F. Supp. 2d at 351 (noting that "whether the comment was made by a decision maker, whether the comment related to the employment decision at issue, and the closeness in time of the action and the remark" were relevant to assess whether comment evinces discriminatory intent).  With that framework in mind, the Court will assess the comments of Dr. Boggs and Dr. Langhoff.

### i.    Dr. Boggs

As stated above, soon after the pay raises at issue, Dr. Boggs, the then Chief of Anesthesiology, purportedly told a group of anesthesiologists, including Dr. Wagh, that the Bronx VA "should not hire any more Jews in the Anesthesia Department."[16]   (Pl.

---

[16] Dr. Wagh's reliance on Dr. Boggs' comment – which, on its face, references Jews, not Orthodox Jews – contradicts other arguments lodged by Dr. Wagh, which are premised on the distinction between Orthodox Jews and non-Orthodox Jews.   Dr. Wagh emphasizes throughout his submissions that he is the only Orthodox Jew who serves as an attending anesthesiologist at the Bronx VA, and cites that in distinguishing himself

56.1 Statement ¶ 67; Def. 56.1 Counterstatement ¶ 67 (admitting in relevant part); *see also* Dr. Wagh Dep. 83:15-20, 84:8-20.)  Defendant does not dispute that this comment was made.  Defendant argues instead that the comment is irrelevant to whether decisions related to Dr. Wagh's compensation were motivated by religious discrimination because Dr. Boggs did not participate in those decisions.  (*See* Def. Reply at 4-5; Def. 56.1 Statement ¶ 11 ("The individuals responsible for pay determinations are Dr. Sarah Garrison, as Chief of Staff, individuals that form each Compensation Review Panel, and Dr. Erik Langhoff, the Medical Center Director."); Def. 56.1 Counterstatement ¶ 66 (alleging that Dr. Boggs "approved the requesting of a salary review by the compensation review panel but did not make decisions regarding salary increase").)  Dr. Wagh disputes this, arguing that Dr. Boggs was "one of two persons to approve the 2017 Market Pay increases" at issue.  (Pl. Opp. at 18; *see also* Pl. 56.1 Statement ¶ 66 (asserting that Dr. Boggs "approved each of the 2017 Market Pay Increases").)

In support of their respective contentions about Dr. Boggs' participation (or lack thereof) in the relevant pay decisions, both parties refer the Court to the Compensation Panel Action forms completed on February 9, 2017.  All such forms are signed by Dr.

---

from his Jewish colleagues.  (*See, e.g.*, Pl. Opp. at 17 ("the pay disparity between his fellow Anesthesia Attendings and Dr. Wagh, the only Orthodox Jew, is not subtle but considerable"); Pl. 56.1 Statement ¶ 11 ("None of the anesthesiologists who worked at the Bronx VA from 2015 through the present, except for Plaintiff, was an Orthodox Jew.").)  But in relying on Dr. Boggs' comment, Dr. Wagh seizes on a statement about Jews generally, not Orthodox Jews specifically.  While it is not for this Court to say who or exactly what group Dr. Boggs meant when he referenced "Jews," the Court cautions that Dr. Wagh cannot credibly argue that evidence of raises given to other Jewish attending anesthesiologists do not negate his claims that he was discriminated against as an Orthodox Jew (Pl. Opp. at 17-18), while also arguing that comments directed towards all Jews generally evidence the animus necessary to support those claims.

Boggs underneath the phrase "SUPERVISOR'S APPROVAL." (Stark Decl. Exs. 12, 24.) Unsurprisingly, the parties interpret Dr. Boggs' signature differently: Dr. Wagh maintains that Dr. Boggs' signature indicates that he approved the physicians' pay increases; Defendant maintains that Dr. Boggs' signed those forms as the respective employee's "supervisor" requesting a salary review but not as a member of the compensation panel. Neither party presents evidence that definitively resolves this dispute; the issue remains one for the factfinder.[17]

To the extent Dr. Boggs is found to be a decisionmaker over the pay raises at issue, and given the timing of his comment being "shortly after" the raises took place, a reasonable jury could find that Dr. Boggs' comment amounts to more than a "stray remark" and further contributes to Plaintiff's *prima facie* showing of discriminatory animus.

### ii. Dr. Langhoff

It is undisputed that Dr. Langhoff, the then Medical Center Director of the Bronx VA, asked Dr. Boggs "Who cares about Wagh?" upon learning that Dr. Wagh was

---

[17] Defendant directs the Court to testimony given by Dr. Langhoff, the then Director of the Bronx VA, in support of its contention that Dr. Langhoff and Dr. Garrison were the individuals responsible for pay determinations. But the testimony cited does not address whether Dr. Boggs was at all involved in pay determinations. (*See* Excerpts from Transcript of Deposition of Erik Langhoff taken Sept. 23, 2019, attached as Ex. 14 to Reddy Decl. ("Langhoff Dep."), 17:12-15 (stating that Langhoff's present title was "Medical Center Director"), 38:24-39:12 (stating that Dr. Garrison was responsible to respond to the attending anesthesiologists' 2016 letter complaining about compensation because "[t]he chief of staff is responsible for all clinical staff and conducts negotiations of salary with HR"), 62:5-11 (stating that Dr. Langhoff approved physicians' "total compensation").) Defendant also points out that Dr. Schwartz replaced Dr. Boggs as the Chief of Anesthesiology in 2017, but that "Plaintiff does not allege that Dr. Schwartz also has involvement in decisions regarding his compensation." (Def. Reply at 4-5 n.2.) While the evidence to which Defendants point is relevant to the issue of Dr. Boggs' role, it hardly resolves it as a matter of law.

dissatisfied with the 2017 raise to his Market Pay.  (Pl. 56.1 Statement ¶ 69; Dr. Wagh Dep. 79:6-11.)   Defendant argues that Dr. Langhoff's comment does not evince discrimination as it "makes no reference to Plaintiff's religion."  (Def. Mem. at 11.)  While the Court acknowledges that Dr. Langhoff's comment does not expressly reference Dr. Wagh's religion, Defendant's position ignores other indicia by which a reasonable jury could find that the comment – albeit vague – amounts to more than a "stray remark," namely that Dr. Langhoff approved the disputed pay raise, that he made this comment "shortly after" doing so, and that he made this comment at or around the same time as Dr. Boggs' comment.  (Pl. 56.1 Statement ¶¶ 67-69.)  *See Henry v.*, 616 F.3d at 149 (listing relevant factors other than content of the statement to determine whether the remark should be considered invidious or stray).   The precise meaning behind Dr. Langhoff's ill-timed comment and whether he had in mind Dr. Wagh's religion when he said "Who cares about Wagh?" is for the factfinder to consider.

### c.    Dr. Garrison's Failure to Address Plaintiff's Initial Discrimination Complaint

Dr. Wagh also claims that Dr. Garrison's failure to address Dr. Wagh's written complaint of discrimination supports a *prima facie* case that Defendant's compensation decisions were motivated by discriminatory animus.   Defendant does not directly respond to this argument, asserting instead that "Dr. Garrison has not made any derogatory comments against Dr. Wagh based on his religion" and that Dr. Wagh's allegations are simply "a series of false suppositions and assumptions" made "to suggest that Dr. Garrison discriminated against him."  (Def. Reply at 6.)

The Second Circuit has held that "[t]he failure of an employer to conduct an adequate investigation or to undertake an appropriate response can constitute evidence

in support of a Title VII plaintiff's allegations." *Sassaman*, 566 F.3d at 314-15; *see also*

*Mandell*, 316 F.3d at 378-79 (employer's failure to investigate allegations of anti-Semitic

atmosphere in the workplace raised an inference of "illegal animus"); *cf. Eka v.*

*Brookdale Hospital Medical Center*, 247 F. Supp. 3d 250, 268 (E.D.N.Y. 2017) (rejecting

argument that failure to investigate allegations of discrimination could serve as basis to

establish *prima facie* case where complaints "never mentioned [plaintiff's] national origin

or claim that [defendant] was discriminating or retaliating against him on the basis of his

national origin").

It is undisputed that Dr. Garrison was the Chief of Staff of the Bronx VA during the

relevant period, recommended the specific amounts for the disputed raises received by

each of the attending anesthesiologists of the Bronx VA in 2017, and served as the

chairperson of the compensation committee that decided those raises.   (Pl. 56.1

Statement ¶ 70.)  In August 2017 (after Dr. Wagh's raise had been increased by another

$10,000 to a Total Pay of $305,000), Dr. Wagh contacted Dr. Garrison to complain that

the 2017 Market Pay raises "appeared to single [him] out for inappropriate

compensation" as "[n]ew and recently hired attending's [sic] with similar credentials, but

no comparable tenure are getting paid the same combined base and locality pay as

[him]."  (Stark Decl. Ex. 26.)

In that email, Dr. Wagh suggested that the pay discrepancies "may also reflect

discrimination (based on my age or religion)" and notified Dr. Garrison that he had

become aware of "derogatory remarks made about [him]" by Dr. Langhoff "in presence

of one or more other Hospital employees."   (Stark Decl. Ex. 26.)   Dr. Garrison

responded to Dr. Wagh's email two days later, stating that "[s]alary determinations within

a given service include many factors, including duration of service and board certification status" and noting that "[t]here has been no intent of discrimination or of retaliation." (Stark Decl. Ex. 26.)  Dr. Garrison could not recall whether she took any further action following Dr. Wagh's initial complaint of discrimination.  (Garrison Dep. 131:19-132:2, 132:11-15.)  But Dr. Garrison acknowledged that she had received EEO training and that such training calls for her to refer complaints of discrimination "to the EEO person in Human Resources." (Garrison Dep. 132:3-10.)

Dr. Wagh clearly communicated his concern to Dr. Garrison that the disputed 2017 raises may have been motivated by "discrimination (based on [his] age or religion)." (Stark Decl. Ex. 26.)  Dr. Garrison's response expressly acknowledges Dr. Wagh's complaint, stating that "[t]here has been no intent of discrimination or of retaliation." (Stark Decl. Ex. 26.)  But there is no evidence before the Court to suggest that Dr. Garrison took any additional steps to investigate Dr. Wagh's complaint, despite her familiarity with policies calling for her to do just that.  Accordingly, Dr. Garrison's inaction in the wake of Dr. Wagh's complaint supports Plaintiff's *prima facie* showing that Defendant's compensation decisions were motivated by discriminatory animus.

In sum, while not all evidence on which Dr. Wagh relies may be probative of discriminatory animus, several aspects are – namely, the magnitude of the Market Pay differential, the comments of Dr. Boggs and Dr. Langhoff, and Dr. Garrison's failure to investigate.[18]  Taking those pieces of evidence together, Dr. Wagh has satisfied his minimal, but essential, burden of showing a *prima facie* claim of discrimination.

---

[18] Dr. Wagh also contends that the 2017 pay increase was "not an isolated incident of disparate treatment" because the same decision makers excluded Dr. Wagh from the 2016 Market Pay increases as well.  (Pl. Opp. at 17.)  The Court acknowledges that argument and its relevance but does not find that it adds materially to the analysis.

Accordingly, the Court will proceed to the second and third prongs of the *McDonnell Douglas* framework to determine whether Plaintiff's claim survives summary judgment.

## B.    Legitimate, Non-Discriminatory Rationale

Under the *McDonnell Douglas* framework, once the plaintiff has made out a *prima facie* case of discrimination – as Dr. Wagh has done here – the burden shifts to the employer to offer some legitimate, nondiscriminatory rationale for its actions. *McDonnell Douglas*, 411 U.S. at 802; *see also Philpott v. State University of New York*, 805 F. App'x 32, 34 (2d Cir. 2020) (summary order) (same).

Defendant argues that Dr. Wagh received a lesser raise to his Market Pay due to his lack of board certification, which made him less marketable, and thus less cost to retain, than his board-certified peers.  (Def. Mem. at 1, 12-13.)  That explanation is corroborated by the Compensation Panel Action forms memorializing each physician's Market Pay raise, which show that in setting Market Pay, Defendant focused on only board certification and local market rates.

Dr. Wagh concedes that Defendant's rationale satisfies the second prong of the *McDonnell Douglas* framework.  (Pl. Opp. at 19-20.)  Accordingly, the Court proceeds to the third step of the *McDonnell Douglas* framework to determine whether Dr. Wagh has produced evidence "sufficient to permit a rational finder of fact to infer that the defendant's decision was more likely than not based … in part on discrimination." *Walsh v. New York City Housing Authority*, 828 F.3d 70, 76 (2d Cir. 2016) (citation omitted).

C.      **Pretext**

At the third step of the *McDonnell Douglas* analysis, the Court must examine the entire record as a whole to determine whether the plaintiff could persuade the trier of fact that his employer intentionally discriminated against him.  *Pineda v. Byrne Dairy, Inc.*, 212 F. Supp. 3d 467, 475 (S.D.N.Y. 2016); *see also Byrnie v. Town of Cromwell, Board of Education*, 248 F.3d 93, 102 (2d Cir. 2001) ("At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discrimination purpose on the part of an employer."); *James v. New York Racing Association*, 233 F.3d 149, 154 (2d Cir. 2000) ("the standard for determining whether the evidence was sufficient to sustain the submission of plaintiff's case to the jury was simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination").  Put differently, a plaintiff may defeat a motion for summary where "'plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'"  *Byrnie*, 248 F.3d at 102 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).

To successfully defeat summary judgment, a plaintiff must present "'specific facts' – not conclusory allegations, speculation, surmise, or 'feelings' – to show the existence of genuine issues for trial."  *Agugliaro v. Brooks Brothers, Inc.*, 927 F. Supp. 741, 748 (S.D.N.Y. 1996).  But because the record must be viewed as a whole, "[n]o one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in

part by discrimination." *Walsh*, 828 F.3d at 76.  Viewing the record as a whole is critical in discrimination cases as each individual piece of evidence, standing alone, might be insufficient to permit a claim to survive summary judgment, but more than suffice when all considered together.  *Danzer*, 151 F.3d at 57-58 (reversing grant of summary judgment where plaintiff's proffered pieces of evidence, taken individually "might arguably be insufficient to permit" discrimination suit to proceed, but "[t]aken altogether as true … are more than enough to support a jury verdict" in his favor); *Pineda*, 212 F. Supp. 3d at 475 ("Taking each piece of evidence individually could lead a court to conclude there is insufficient evidence to permit a finding of discrimination, but when taken together, the evidence may be enough to support a jury finding of discrimination.").

In addition to the evidence offered in support of his *prima facie* case, Dr. Wagh offers additional evidence in support of his argument that a reasonable jury could disbelieve Defendant's "legitimate, nondiscriminatory rationale": (1) Defendant's failure to demonstrate that – at the time they were made – the 2017 raises to attending anesthesiologists were supported by evidence of differential pay between board-certified and non-board-certified anesthesiologists; and (2) Defendant's failure to consider all statutory factors that must be considered in determining Market Pay.[19] Taken together, those facts, if established along with those from Dr. Wagh's *prima facie* case, could support a reasonable jury's finding of discrimination.  The Court briefly addresses, first, however, the relative strength of Dr. Wagh's *prima facie* case.

---

[19] Dr. Wagh dissects the supporting evidence into seven different categories.  (Pl. Opp. at 20-21.)  The Court has condensed them into five: magnitude of pay differential, invidious statements, failure to investigate, content and timing of market data, and failure to consider all statutory factors.

### 1.    Strength of *Prima Facie* Evidence of Discriminatory Animus

The Second Circuit has directed that one of the relevant factors to be considered in determining whether a plaintiff has satisfied the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff" is "the strength of the plaintiff's *prima facie* case."   *James*, 233 F.3d at 156 (first quoting *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000); and then quoting *Reeves*, 530 U.S. at 148-49).  As noted above, Plaintiff proffered three bases for establishing a *prima facie* case of discriminatory animus: (1) the "considerable" disparity between Dr. Wagh's Market Pay raise and those of his non-Orthodox colleagues; (2) allegedly "invidious" statements by Drs. Boggs and Langhoff, both of whom participated in determining Dr. Wagh's raise; and (3) Dr. Garrison's failure to investigate Plaintiff's initial complaint of discrimination.

Although establishing a *prima facie* case, the evidence provided by Dr. Wagh is far from strong.  For instance, a reasonable jury could readily find that Dr. Boggs' comment about Jews had nothing to do with Orthodox Jews specifically and that Dr. Langhoff's "Who cares about Wagh?" comment had nothing to do with religion.  This is not a case, for example, where discriminatory comments are clear, unequivocal, and frequent.  And, although the Market Pay component of Dr. Wagh's pay is very much at issue, Defendant's explanation that it sought to bring everyone's total salary in line with what the external market for anesthesiologists would bear could well be compelling depending on what the jury finds in evaluating Defendant's motivation.

Having acknowledged that Dr. Wagh's *prima facie* case is relatively thin, the Court proceeds to the additional evidence that Dr. Wagh argues could lead a

reasonable jury to conclude that Defendant's explanation for its pay decisions was motivated by discriminatory animus.

### 2.    Research of Pay Differences for Board-Certified Anesthesiologists

Dr. Wagh argues that the documents memorializing Defendant's calculation of the 2017 pay raises cast doubt on Defendant's legitimate, nondiscriminatory basis for awarding Dr. Wagh a lesser raise than his colleagues.  Specifically, Dr. Wagh points to the identical Market Pay analysis recorded on the Compensation Panel Action forms memorializing each physician's Market Pay raise, and argues that it does not support paying board-certified and non-board-certified attending anesthesiologists differently. (Pl. Opp. at 21.)  Defendant does not directly respond to that point, instead pointing to evidence that Dr. Garrison "spoke to all the chiefs of staff" in the region to determine whether board-certified anesthesiologists had different salaries than non-board-certified anesthesiologists and, through that research, found that non-board-certified anesthesiologists were paid approximately $25,000 less.  (Def. Reply at 9.)

The timing of these actions is significant.  All Compensation Panel Action forms cited are dated February 9, 2017.  (*See* Stark Decl. Exs. 12, 24.)  As Dr. Wagh suggests, the Compensation Panel Action forms are relatively bare, reflecting only certain "Labor Market Data" and whether each physician maintained any board certifications.  (Stark Decl. Exs. 12, 24.)  The Labor Market Data cited is identical for each attending anesthesiologist and provides no salary data differentiating between board and non-board certification.  (*See* Stark Decl. Exs. 12, 24; *see also* Garrison Dep. 198:19-199:3 (affirming that "the information about Dr. Wagh's market value is the same as everyone else's").)  As Dr. Garrison's testified, the Bronx VA's Human Resources

department could not find information "concerning market pay of non-board-certified anesthesiologists in New York" when asked (though the timing of that ask is similarly unclear).  (Garrison Dep. 84:9-14; *see also* Stark Decl. Ex. 28 (email from Dr. Garrison dated August 15, 2018, noting that the "HR data … doesn't include information on board certification").)

The timing of Dr. Garrison's conversations with fellow chiefs of staff regarding compensation between board-certified and non-board-certified anesthesiologists occurred is decidedly less clear.  Defendant does not place these conversations at a certain point in time, and does not cite to any record evidence to suggest that they occurred before the 2017 market pay raises went into effect.  But Dr. Wagh cites to record evidence that suggests Dr. Garrison's conversations with fellow chiefs of staff took place *after* Plaintiff's initial complaint of discrimination.  For example, in response to a question asking what, if any, actions Dr. Garrison took to investigate the difference between board-certified and non-board-certified wages after Dr. Wagh's August 2017 complaint, Dr. Garrison stated that she "spoke with all of the chiefs of staff in our region and asked them about board certification and if they had different salaries" and learned that "most of the facilities only employed board certified anesthesiologists," but those that employed both tended to pay non-board-certified anesthesiologists at least "$25,000 less."  (Garrison Dep. 146:5-25.)

Similarly, Dr. Garrison sent an email approximately a year after Dr. Wagh's initial complaint that summarized data collected on salary differences between board-certified and non-board-certified anesthesiologists.  (Stark Decl. Ex. 28.)  Dr. Garrison's language – that the data included was "what [she] was able to find," that she has "heard

from the Chief[s] of Staff of other sites with a surgical program," and that "non board certified physicians are paid significantly less than their board-certified colleagues" – could be interpreted to suggest that she was having those conversations and gathering that data at the time of the email – i.e., a year after the raises went into effect and Dr. Wagh lodged his initial complaint of suspected religious discrimination.  (Stark Decl. Ex. 28.)

It is not the Court's role to resolve what information Defendant was armed with when.  Based on the above, however, a reasonable juror could conclude that neither Dr. Garrison nor her fellow decision-makers possessed market data evidencing the extent of any pay differential between board-certified and non-board-certified anesthesiologists when the disputed pay decisions were made.  This could accordingly discredit Defendant's proffered "legitimate, nondiscriminatory" basis for giving Dr. Wagh a substantially lower Market Pay raise to the extent they did.

### 3.   Application of Statutory Pay Factors

As explained above, the guidelines for calculating the Market Pay for attending anesthesiologists employed by the Bronx VA are codified in 38 U.S.C. § 7431(c).  The Act states that a physician's Market Pay is "pay intended to reflect the recruitment and retention needs for the specialty or assignment … of a particular physician … in a facility of the Department of Veterans Affairs" and is "determined … on a case-by-case basis."  38 U.S.C. § 7431(c)(2)-(3).  To determine that figure, the statute requires that certain factors be considered, including, but not limited to, the physician's "level of experience" in his specialty, "the need for the … assignment of the physician … at the medical facility of the Department concerned," the physician's "board certifications, if

any," and the physician's "prior experience, if any … as an employee of the Veterans Health Administration."  38 U.S.C. § 7431 (c)(4)(A), (B), (C), (E).

Defendant considered two factors in determining the 2017 raises to market pay: board certification and local market pay.    (Garrison Dep. at 203:9-19.)   Indeed, the Compensation Panel Action forms memorializing the 2017 Market Pay raises leave blank the sections for other statutory factors to be considered in determining Market Pay.  (Pl. 56.1 Statement ¶¶ 59, 61; Stark Decl. Exs. 12, 24.)  Defendant maintains that the decision to focus on those two factors was "legitimate" as "it was appropriate for the VA to consider whether their competitors would hire their anesthesiologists and the potential pay that they would receive" and "[i]t was also reasonable for management to conclude that board certification had a correlation to marketability and make salary determinations accordingly."  (Def. Mem. at 12.)

There is no question that it was appropriate and relevant to consider local market rates and board certification in calculating Market Pay.  After all, the Act specifically calls for a decision-maker to consider "the health care labor market for the specialty" and board certification when calculating Market Pay.  38 U.S.C. 7431(c)(4)(C), (D).   But Defendant's apparent decision to stop the inquiry there in the face of the statute's clear mandate to do otherwise reasonably calls Defendant's legitimate, nondiscriminatory basis for the pay decisions at issue into question.   That is particularly so as consideration of the remaining factors – such as experience as a physician and experience with the VA – likely would have benefited Dr. Wagh, who had "many more years of experience as an anesthesiologist, and had worked for the VA longer, than each of the other staff anesthesiologists …."  (Pl. 56.1 Statement ¶ 56.)

Accordingly, Defendant's deviation from the statutory factors controlling the calculation of Market Pay could be interpreted by a reasonable jury as evidence that Defendant's stated basis for awarding Dr. Wagh a lower market pay raise in 2017 was a pretext for discrimination.  *See McCalla v. City of New York*, No. 15-CV-8002, 2017 WL 3601182, at *25 (S.D.N.Y. Aug. 14, 2017) (concluding that New York City Department of Buildings' failure to follow civil service rules controlling promotion decisions contributed to inference that defendants' proffered bases for challenged hiring decisions were pretextual).

In sum, Dr. Wagh has carried his burden to demonstrate (1) that disputed issues of material fact exist as to whether a reasonable jury could find that the disparities in his Market Pay and Total Pay as compared to his similarly situated, non-Orthodox colleagues, were motivated at least in part by discriminatory animus; and (2) that a reasonable jury could disbelieve Defendant's proffered legitimate, nondiscriminatory basis for those decisions.  Although no one piece of evidence cited by Dr. Wagh may alone be sufficient to show that Defendant's pay decisions were more likely than not motivated by discrimination, consideration of the facts together – the magnitude of pay differences between Dr. Wagh and his non-Orthodox colleagues; the statements made by Dr. Boggs an Dr. Langhoff; failure to investigate Dr. Wagh's initial claim of discrimination; after-the-fact justification of Defendant's pay decisions; and failure to consider all statutory factors that must be considered when determining Market Pay for a VA physician – are sufficient to defeat summary judgment.

D.      **A Similar Case with a Different Outcome**

Although neither party cites it, the Court has identified a case that is quite similar to this one in many respects, ultimately distinguishable, but worthy of discussion. *See Moore-Stovall v. Shinseki*, 969 F. Supp. 2d 1309 (D. Kan. 2013). In *Moore-Stovall*, the plaintiff was an African-American female board-certified radiologist. *Id.* at 1312. By the time she left in 2008, she had worked 29 years at the VA Medical Center in Leavenworth, Kansas, part of the Eastern Kansas Health Care System ("EKHCS"). *Id.* In 2006, the VA changed its pay system – which had been based primarily on longevity, job description, and job grade – to the current system composed of Base Pay, Market Pay, and Performance Pay (although Market Pay was based on eight factors, not five as in the instant matter). *Id.* at 1313.

Applying the new pay system, the EKHCS compensation panel awarded raises as a result of which plaintiff received a 5.43% increase in salary to $195,000, while four of her colleagues received much higher percentage increases – 13.18%, 18.42%, 17.68%, and 17.32% – resulting in total salaries of $215,000, $215,000, $200,000, and $190,000. Another colleague, who was not board certified in any specialty, received no raise and maintained a total salary of $165,957. (*Id.* at 1314-15.) As a result of these new salaries, plaintiff, like Wagh, went from being one of the most highly paid of her colleagues to one of the lowest. (*See id.* at 1323.)

The compensation panel's objective in setting the new salaries was to "set a pay rate comparable to what the physician would earn outside the VA." (*Id.* at 1325.) In furtherance of that objective, the compensation panel considered each doctor's responsibilities, length of experience, specialization, quality of work and productivity,

and other factors.  (*See id.* at 1323-24.)  In comparison to her higher paid colleagues, plaintiff had no supervisory responsibilities, practiced in only one of two specialties (and the less-valued one at that), had weaker performance in both quality and productivity, and was perceived by the panel as less likely than others to leave the VA.  (*Id.* at 1324.) During 2006 and 2007, Plaintiff was cited for various infractions, and in late 2007 her proficiency ratings included a "Low Satisfactory" rating.  (*Id. at* 1315-1318.)  Plaintiff retired in 2008 and sued the VA, claiming discrimination based on race, gender, and national origin, as reflected by her receiving a comparatively low pay raise in 2006, being unfairly cited for policy infractions, and constructive discharge.  (*Id.* at 1321.)

With respect to pay, the court "assume[d] for the sake of argument" and "for purposes of summary judgment" that plaintiff had set forth a *prima facie* case of discrimination.  (*Id.* at 1323.)  In so doing, however, the court noted that the record was "not clear" as to whether any of the other radiologists were similarly situated to plaintiff and faulted plaintiff for "lump[ing] together all radiologists, without regard to board certification, supervisory duties, and other factors which were relevant under the 2006 compensation plan." (*Id.* at 1322 & n.17.)  The court found that the VA had a legitimate, non-discriminatory reason for its differential pay determinations, namely that as compared to her colleagues, plaintiff had no supervisory responsibilities, she practiced only one of two specialties, that specialty was lower paid in the industry, she produced lower quality work with less productivity, and she was less prone to leave the VA.  (*Id.* at 1324.)

The court ultimately determined that plaintiff had not presented evidence by which a rational jury could find that the VA's stated reasons were pretextual.  Plaintiff

did not offer evidence discrediting the VA's explanation; she did not contest the facts on which the VA's reasons rested (i.e., her having no supervisory responsibilities, practicing only one specialty within radiology, etc.); and she offered no evidence that the VA failed to follow its policy for making the pay determination.  (*Id.* at 1326.)  The Court therefore granted summary judgment against plaintiff.  (*Id.* at 1332.)

As can be seen, the plaintiff in *Moore-Stovall* bears similarities to Dr. Wagh. Both received a noticeably lower percentage raise to Market Pay compared to their colleagues.  Both went from being one of the highest paid to one of the lowest paid. Both lacked a credential with value – one of two radiology specialties for the *Moore-Stovall* plaintiff, and board certification at all for Dr. Wagh.  Both claimed their longevity with the VA was not sufficiently recognized.  And, in both cases, the VA had a similar objective – to adjust Total Pay to be commensurate with local market rates.

But there are important differences.  Unlike the plaintiff in *Moore-Stovall*, Dr. Wagh practiced and could do everything that his colleagues did.  Unlike the plaintiff in *Moore-Stovall*, Dr. Wagh was uniformly and consistently praised and recognized as central to the department.  Unlike the plaintiff in *Moore-Stovall*, there is no evidence that Dr. Wagh performed work of lesser quantity or quality.  Unlike the plaintiff in *Moore-Stovall*, Dr. Wagh had similar responsibilities to his colleagues.  In other words, many of the differentiating factors that justified differential pay in *Moore-Stovall* are not present here.

At the same time, again unlike the plaintiff in *Moore-Stovall*, Dr. Wagh has presented evidence by which a rational jury could find that Defendant's proffered rationale is pretextual.  Dr. Wagh has come forward with evidence of statements that

could be construed as discriminatory based particularly on their timing, context, and who made them; the plaintiff in *Moore-Stovall* offered none.  Dr. Wagh has presented evidence that Defendant did not consider multiple factors that the Act mandates be considered in setting Market Pay; the plaintiff in *Moore-Stovall* presented no such evidence.   Dr. Wagh has come forward with evidence that his complaint of discrimination was not properly followed up on; the plaintiff in *Moore-Stovall* presented no such evidence.   In short, whereas summary judgment was warranted in *Moore-Stovall*, it is not warranted here.

### Conclusion

To be clear, Dr. Wagh may well not prevail at trial.  But he has presented sufficient evidence to try.  For the reasons stated above, the Court concludes that Dr. Wagh has presented evidence that is sufficient to permit a rational jury to infer that Defendant's decision to pay him less than his similarly situated colleagues was, at least in part, motivated by religious discrimination.   Accordingly, Defendant's motion for summary judgment is DENIED.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: September 24, 2020
          New York, New York

Copies transmitted this date to all counsel of record.